**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

QUINN POINDEXTER,

                    Petitioner,              Case Number: 05-CV-71607

v.                                     HONORABLE AVERN COHN

RAYMOND BOOKER,

                    Respondent.

_____/

## <u>OPINION AND ORDER CONDITIONALLY GRANTING</u>
## <u>PETITION FOR WRIT OF HABEAS CORPUS</u>

### I. Introduction

This is a habeas case under 28 U.S.C. § 2254.  Petitioner Quinn Poindexter (Petitioner) is a state inmate.  Petitioner filed a <u>pro se</u> petition for a writ of habeas corpus claiming that he was denied his right to the effective assistance of counsel and that he is actually innocent.  Subsequently, Petitioner obtained counsel who filed a supplemental brief.  The supplemental brief presents no new claims.  Rather, it presents further support for the claims presented in the petition.  Respondent filed a response, arguing that Petitioner's claims lack merit.  For the reasons that follow, Petitioner received ineffective assistance of counsel and the state court's finding to the contrary was an unreasonable application of  Supreme Court precedent.  As such, the petition will be conditionally granted.

II.  Facts and Procedural History

Petitioner was charged in Wayne County Circuit Court with assault with intent to murder and felony firearm, in connection with the shooting of Timothy Ruff on January 11, 2000, on Hazelwood Street in Detroit.  Following a bench trial, Petitioner was convicted of the lesser offense of assault with intent to commit great bodily harm less than murder and possession of a firearm during the commission of a felony.  Petitioner was sentenced to thirteen-and-a-half to twenty years imprisonment for the assault conviction to be served consecutively to two years imprisonment for the possession of a firearm conviction.

It was the prosecution's theory that Petitioner came out of his home on Hazelwood Street, and, absent any warning or any known provocation, fired multiple shots at Timothy Ruff, who was walking down Hazelwood Street at the time.  Six prosecution witnesses testified at trial.  The victim was the first witness.

Ruff testified that, on the evening of January 11, 2000, at approximately midnight, he went to a liquor store with Tyrone Jackson and Sam Bettis (who lived with his sister, Cecilia Bettis, on Hazelwood Street).  The threesome returned to Cecilia Bettis' house sometime between 12:30 and 1:00 a.m.  Approximately forty-five minutes later, the three men returned to the liquor store.  Ruff and Sam Bettis purchased more beer and left to return to Cecilia Bettis' house.  Along the way, they stopped at another friend's house.  After chatting awhile, Sam Bettis left to return to the house.  Ruff left a few minutes later.  As he was walking down Hazelwood toward Cecilia Bettis' house, he saw Petitioner running out of his home with a gun and shooting "with no consideration, whatsoever, about who he shooting at."  (Tr., Vol. I, p. 11.)  Ruff knew Petitioner by the

nickname Big-Fifty. He had seen Petitioner several times prior to the shooting. Petitioner ran down the porch steps and turned and fired at Ruff. Ruff testified that Petitioner was not wearing a shirt, pants, socks or shoes, and was carrying a long gun. He described Petitioner as being between six feet two inches and six feet four inches tall, and approximately 265 pounds. After Petitioner started shooting, Ruff started to run. He was hit by the third shot. He was then hit by another shot. Ruff passed out. When he awoke he was still on the ground, and he heard Cecilia Bettis' voice. Someone asked him who shot him. Ruff testified that, although he thought it was Petitioner who shot him, he did not mention Petitioner's name because he was fearful that Petitioner would hear him and shoot him again.

Ruff was taken to the hospital. He lost both his eyes as a result of the shooting. He testified that he had never had any sort of a dispute with Petitioner. He knew Petitioner to drive a black motorcycle.

On cross-examination, Ruff admitted that he had about two 40-ounce beers the evening of the shooting. Ruff also testified that the closest Petitioner ever got to him with the gun was ten to fifteen yards.

Detroit Police Officer Jevon Johnson testified that he and his partner Officer Glaza responded to a report of a shooting on Hazelwood Street during the early morning hours of January 11, 2000. Ruff was writhing on the ground, bleeding profusely and had obviously lost both of his eyes. Johnson asked Ruff who had done this to him. Ruff pointed across the street and said "it's the third house." (Petitioner resided in the third house). (Tr., Vol. I, p. 54.) Johnson and his partner transported Ruff to the hospital because they did not believe Ruff would survive if they waited for an

ambulance.

Detroit Police Officer John Burris testified that he responded to a report of shots fired on Hazelwood. He secured the scene after Ruff was transported to the hospital, but did not do any canvassing. He testified that he observed a four or five foot radius of blood surrounding where Ruff had been lying. He did not observe any blood trail. Burris found a .45 shell casing near where Ruff had been.

Detroit Police Officer Brian Fields testified that he helped to secure the scene of the shooting. He requested a K-9 team to determine whether a track could be established from the site where the victim was found to where the shooting was located; the request was denied.

Cecilia Bettis testified that, on January 11, 2000, she lived at 2225 Hazelwood, in a two-family home. She resided in the lower flat, and her brother, Samuel Bettis resided in the upper flat. She testified that Petitioner lived across the street from her and that she knew him by the nickname "Fifty." At approximately 2:00 a.m., on January 11, she heard approximately six gunshots. Moments later, she heard someone calling her brother's name. She knocked on her brother's door, but he did not answer. She recognized the voice to be Ruff's. She then went outside. Bettis observed Petitioner on the front porch of his home with a phone in his hand. Petitioner was wearing a shirt. She believed that Petitioner said he had called the police.

The prosecution's final witness was Walter Petty. Petty was appearing under a material witness detainer. He testified that, at the end of January 2000, he and

Petitioner were questioned by police regarding a matter unrelated to the shooting.[1] At that time, Petty informed police that Petitioner had admitted that three men had tried to break into his car, they fired shots at him, and he returned fire. Petty testified that Petitioner told Petty about the shooting on the night that it occurred. Petitioner showed up at Petty's girlfriend Tamika Thomas's house, located approximately one mile from the site of the shooting. Petty said he and Petitioner were not good friends. He could not explain how Petitioner knew where to find him or why Petitioner would choose to confide in him.

Petty testified that, in response to a request from Petitioner, Petty walked to the site of the shooting and asked police officers at the scene what had occurred. After speaking to an officer at the scene, Petty returned to his girlfriend's home where Petitioner was waiting. Petitioner said he had shot someone with an AK-47. Petty later learned from his mother-in-law that Petitioner had brought an AK-47 to his home on Waltham Street.[2] Petty did not observe Petitioner placing the gun at his home. Although Petty earlier had denied having a close relationship with Petitioner, he explained that Petitioner could have placed the gun in his home because Petitioner "had access to everything" at the home. (Tr., Vol. I, p. 124.)

Petty admitted that he owned an AK-47. Petty described Petitioner as being

---

[1] Petty was at the police station at the end of January because he was involved in an altercation with another man who Petty believed had stolen his wife's handgun. A gun was discharged during the altercation. It appears from the record that no one was injured.

[2] At trial, Petty testified that the home on Waltham was his home. However, several witnesses testified that Petty resided with Petitioner on Hazelwood. This inconsistency is never resolved on the record.

approximately 6'5" to 6'6" tall and weighing 350 pounds.

Defense counsel did not present any witnesses in Petitioner's defense.

The trial court found Petitioner guilty of assault with intent to do great bodily harm and felony firearm. The findings of fact are discussed in detail below. As noted above, Petitioner was sentenced to 13-1/2 to 20 years imprisonment for the assault conviction and two years imprisonment for the felony-firearm conviction.

Petitioner filed an appeal of right to the Michigan Court of Appeals, presenting the following claims:

I.      [Petitioner's] state and federal fair trial rights were violated by trial counsel's ineffectiveness. Counsel failed to present a defense; failed to call credible witnesses who were available; misadvised [Petitioner] not to testify; failed to disclose his prior representation of the prosecutor's star witness; and failed to present the available medical records or call the physician who treated the complainant's gunshot wounds whose testimony could have dramatically contradicted the complainant's version of the shooting.

II.     At sentencing, the trial court failed to resolve a challenged juvenile conviction relied on by the probation department when computing [Petitioner's] guidelines. Thereafter, citing substantial and compelling reasons for upward departure, the court imposed the statutory maximum 13 ½-20 year sentence. The stated reasons for departure had already been considered in the guideline scoring range. [Petitioner] must be resentenced.

Petitioner also filed a motion to remand for an evidentiary hearing, pursuant to People v. Ginther, 390 Mich. 436 (1973), on his ineffective assistance of counsel claim. The Michigan Court of Appeals granted the motion. People v. Poindexter, No. 233907 (Mich. Ct. App. Apr. 25, 2002). As will be explained, after three days of testimony, the trial court concluded that counsel was not ineffective.

Petitioner then renewed his appeal in the Michigan Court of Appeals, claiming

that counsel was ineffective because trial counsel: (1) failed to present a defense; (2) failed to call credible and available defense witnesses; (3) advised defendant not to testify; (4) failed to disclose his prior representation of a prosecution witness; and (5) failed to call an expert or physician to explain the contents of the victims medical records. Plaintiff also asserted a claim of actual innocence. The Michigan Court of Appeals affirmed the convictions. <u>People v. Poindexter</u>, No. 233907 (Mich. Ct. App. Oct. 21, 2003).

Petitioner then filed an application for leave to appeal in the Michigan Supreme Court, presenting the following claim:

> [Petitioner] is actually innocent. His bench trial guilty verdict has resulted in a miscarriage of justice. His actual innocence was verified by polygraph evidence. The Court of Appeals accepted the polygraph results but failed to consider it in its affirmance of [Petitioner's] convictions. Trial counsel's ineffectiveness denied [Petitioner's] state and federal constitutional rights, denied him a fair trial, and caused his wrongful conviction.

The Michigan Supreme Court denied leave to appeal. <u>People v. Poindexter</u>, 471 Mich. 877 (Mich. 2004).

Petitioner then filed the pending petition for a writ of habeas corpus, presenting the following claims:[3]

I. The state court's decision that trial counsel was not ineffective was contrary to and an unreasonable application of Supreme Court precedent.

II. Petitioner is actually innocent.

_____

[3] Petitioner does not set forth a statement of "issues presented." Therefore, these issues are paraphrased based upon a review of the petition and supplemental brief.

III. Standard of Review

28 U.S.C. § 2254(d) imposes the following standard of review that a federal court must utilize when reviewing applications for a writ of habeas corpus:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1)      resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)      resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1).

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. Williams v. Taylor, 529 U.S. 362, 405-06 (2000). An "unreasonable application occurs" when "a state-court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." Id. at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 410-11.

## IV.  Analysis

### A.  Ineffective Assistance of Counsel Generally

To establish that he received ineffective assistance of counsel, a petitioner must show, first, that counsel's performance was deficient and, second, that counsel's deficient performance prejudiced the petitioner.  Strickland v. Washington, 466 U.S. 668, 687 (1984).  A petitioner may show that counsel's performance was deficient by establishing that counsel's performance was "outside the wide range of professionally competent assistance."  Id. at 689.  This "requires a showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  Id. at 687.  To satisfy the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id. at 694.  "[T]he focus should be on whether the result of the trial was 'fundamentally unfair or unreliable.'"  Tinsley v. Million, 399 F.3d 796, 802 (6th Cir. 2005), quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993).

"Because advocacy is an art and not a science, . . . [counsel's] strategic choices must be respected," if they were "made after thorough investigation of law and facts relevant to plausible options."  Strickland, 466 at 690.  The Supreme Court explained:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proven unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

Id. at 689.

The Michigan Court of Appeals, although not citing Strickland, clearly relied upon the Strickland standard in denying Petitioner's claim. Thus, utilizing the AEDPA's deferential standard, it must be determined whether the state court's application of Strickland was unreasonable.

### B. The Allegations of Ineffectiveness

Petitioner claims that his trial counsel was ineffective in six respects, as follows:

1. Trial counsel failed to interview and call two witnesses, Dion Griffin and Sabrina Moore, who would have provided an alibi defense for Petitioner and place Walter Petty at the scene of the crime minutes before the shots were fired.

2. Trial counsel failed to subpoena and produce two witnesses, Juawanda and Robert Robinson, who would have supported the theory that either Petty or an individual known as "Red" was the shooter.

3. Trial counsel failed to present expert testimony regarding a medical report which contradicted Ruff's account of the shooting.

4. Trial counsel failed to interview key prosecution witnesses, Cecilia Bettis and Walter Petty, prior to trial.

5. Trial counsel failed to disclose a potential conflict of interest and keep him apprised of the preparation of his defense

6. Trial counsel failed to present Petitioner as a witness in his own defense

As will be explained, Petitioner is entitled to habeas relief on the ground that trial

counsel failed to interview and call Dion Griffin and Sabrina Moore and on the grounds that trial counsel failed to produce Juawanda and Robert Robinson (grounds 1 and 2 above).  As to the trial counsel's failure to present expert testimony (ground 3), trial counsel was ineffective but Petitioner fails to show prejudice resulting from such ineffectiveness.  As to the remaining grounds, Petitioner has failed to show trial counsel was ineffective.

1.  Failure to Call Witnesses Griffin and Moore

a.

First, Petitioner claims that trial counsel was ineffective in failing to interview and call two witnesses, Dion Griffin and Sabrina Moore, who would have provided an alibi defense for Petitioner and placed Walter Petty at the scene of the crime minutes before the shots were fired.

At the <u>Ginther</u> hearing, Sabrina Moore testified that Petitioner was her fiancee at the time of the shooting and she lived with him on Hazelwood.  Also living there were Dion Griffin and Walter Petty.  The evening of the shooting, she and Petitioner and Griffin and his girlfriend retired to their respective bedrooms for the night.  Shortly after that, Walter Petty entered the house, ranting about someone owing him money.  He made a phone call, then left the home.  Approximately fifteen minutes later, she heard gunshots outside.  She, Petitioner, Dion and his girlfriend went to the front porch.  A neighbor shouted for them to call the police.  Petitioner had a phone in his hand and called the police.

Sabrina Moore testified that trial counsel never interviewed her regarding the night of the shooting.  When she tried to provide details about that night, he simply

reassured her that he had everything under control and did not listen to what she said.

Dion Griffin testified at the <u>Ginther</u> hearing that he was at the home he shared with Petty and Petitioner on the night of the shooting. After Griffin and his girlfriend retired to his bedroom, and Petitioner and his girlfriend to theirs, Petty entered the home, took the phone to his bedroom, and made a phone call using an "aggressive" tone with the person on the other end. (Ginther Hearing Transcript (GHT) at p. 81.[4]) Approximately ten minutes later, Petty left. Ten minutes after Petty left, Griffin heard three or four gunshots. He and his girlfriend exited his bedroom. Moments later, Petitioner and his girlfriend left theirs. Petitioner, who was carrying a telephone, went onto the front porch, Griffin followed. A neighbor, Bettis, told the men to call the police. Petitioner responded that he was calling the police. Griffin had known Petty for approximately six years prior to the shooting. He knew Petty to own several guns. He never knew Petitioner to have any guns.

Griffin testified that he joined Petitioner once for a meeting with trial counsel at his office. In Griffin's opinion, trial counsel was interested only in obtaining money from Petitioner and not in building a defense. Griffin saw trial counsel at the courthouse prior to Petitioner's trial and suggested that he testify at trial. Griffin described his interaction with trial counsel as follows

> We [Griffin and Petitioner's girlfriend, Sabrina Moore] had said why don't we, you know, of course take the stand. I know what is going on. And she knows what is going on. And if I am not, I won't quote this, but he saying to effect of like; you're too good of friends or you too close to that, the judge wouldn't go for that, or anything, something to that effect. Like I

---

[4] Although the <u>Ginther</u> hearing occurred over several days, the transcript pages are consecutively numbered.

don't want to use it, but it was something every unpositive about us testifying.

(GHT at p. 87.)

At the hearing, trial counsel admitted that he did not interview Petitioner's girlfriend Sabrina Moore, who testified she was with Petitioner the night of the shooting. (GHT at p. 31.) He did not recall whether he had interviewed Dion Griffin.[5] (GHT at pp. 31-32.) When asked why he did not call Dion Griffin to testify, trial counsel replied, "I

---

[5] During the <u>Ginther</u> hearing, trial counsel failed to recall many details of his representation of Petitioner. He could not consult his file because, according to his testimony, the file had been lost. The absence of the file was of great concern to Petitioner's counsel at the <u>Ginther</u> hearing, but, that concern, unfortunately, was not shared by the trial court. Trial counsel testified that he moved two or three times, to different floors within the same building, between the time of trial and the hearing. He believed that the file was lost during one of those moves. Trial counsel testified that other files were also lost during the moves. But, trial counsel could not identify which other files were lost or when he became aware that the files were lost. He did not notify anyone that the files were lost. Petitioner's attorney asked trial counsel whether he reported the loss of files to the moving company. However, the trial court judge, absent any objection from the prosecutor, cut-off any further questioning on this subject:

> The Court: It is not likely that you are going to get any information that is going to track down that, in this hearing, and it's not the issue of this hearing to track it down. The issue of this hearing is that you ask questions relevant to a <u>Ginther</u> hearing.

> Mr. Halpern: All right. And the file, itself, would be really relevant toward the issue of the <u>Ginther</u> hearing, your Honor.

> The Court: We don't have that here today. Please move on.

(GHT at pp. 11-12.)

Petitioner's attorney moved to recall trial counsel at the end of the <u>Ginther</u> hearing to question him regarding lease documents which contradicted trial counsel's claim that he moved offices several times following Petitioner's trial. The trial court judge denied the motion because the court found the fate of the file was a collateral issue.

can't honestly give you an answer to that." (GHT at p. 35.)

Trial counsel summarized his theory of the case as follows:

You either believe who testified or you didn't believe who testified. That's the theory upon which I presented the case.

Id. at p. 36.

Following the Ginther hearing, the trial court held that trial counsel was not

ineffective in failing to call these two alibi witnesses. The following is the entirety of the

trial court's opinion on this issue:

As far as the trial strategies, [trial counsel] believed that nobody would believe the alibi witnesses; there is certainly an issue of trial strategy there. And the court cannot conclude that this would be ineffective assistance of counsel, making that decision or making that recommendation to the defendant.

(GHT at p. 215.)

The Michigan Court of Appeals affirmed the trial court's opinion on this issue,

stating:

The trial court concluded that defense counsel's failure to call the alibi witnesses was a matter of trial strategy. Indeed, the alibi witnesses were residents in defendant's home and had a motive to lie for defendant. . . . Therefore, defense counsel made a strategic decision to focus on challenging the credibility of the prosecution's witnesses and the ability of the victim to identify the shooter. We cannot conclude that the trial court's factual findings with regard to this issue were clearly erroneous. LeBlanc, *supra*.

Poindexter, slip op. at 3.

b.

Trial counsel's decision not to present alibi witnesses because they may have

had a motive to lie was not based in sound trial strategy, and the Michigan Court of

Appeals' decision to the contrary was an unreasonable application of Supreme Court

14

precedent. "Despite the strong presumption that defense counsel's decisions are guided by sound trial strategy, it is not sufficient for counsel to merely articulate a reason for an act or omission alleged to constitute ineffective assistance of counsel. The trial strategy itself must be objectively reasonable." Miller v. Francis, 269 F.3d 609, 616 (6th Cir. 2001). *See also* Fisher v. Gibson, 282 F.3d 1283, 1296 (10th Cir.2002) ("[T]he mere incantation of 'strategy' does not insulate attorney behavior from review."); *See also* Paine v. Massey, 339 F.3d 1194, 1200 (10th Cir. 2003); Hardwick v. Crosby, 320 F.3d 1127, 1186 (11th Cir. 2003) ("[A]ttorney strategy is not a shield or panacea" for failure to provide adequate representation.).

Trial counsel did not forego the alibi defense in favor of a better defense. An attorney's decision not to a call a witness is protected as trial strategy only "to the extent the decision followed a reasonable investigation." Wiggins v. Smith, 539 U.S. 510, 523 (2003). No such investigation took place here. The decision to challenge the credibility of the prosecution's witnesses and the ability of the victim to identify the shooter did not prevent counsel from also presenting an alibi defense. Instead, presentation of an alibi defense along with an attack on the prosecution's witnesses would have provided the best defense. Excluding alibi witnesses based solely upon their close relationship to a defendant is unreasonable given that, by their very nature, most alibi witnesses have a relationship with the defendant. Moreover, trial counsel did not decline to call Griffin and Moore after investigating their potential testimony and evaluating their individual merit as witnesses. Instead, he failed to interview Moore and declined to explore Griffin's potential testimony with him. Thus, trial counsel's decision not to call alibi witnesses was outside the wide range of professionally competent assistance and the

state court's decision to the contrary was an unreasonable application of <u>Strickland</u>.

It must now be determined whether this claim satisfied the prejudice prong of <u>Strickland</u>. To establish prejudice, Petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.

> A reasonable probability is a probability sufficient to undermine confidence in the outcome, ... but something less than a showing that the outcome more likely than not would have been different .... While the petitioner need not conclusively demonstrate his actual innocence, ... the focus should be on whether the result of the trial was fundamentally unfair or unreliable . . .

<u>Stewart v. Wolfenbarger</u>, 468 F.3d 338, 360 (6th Cir. 2006)<i>, quoting</i> <u>Bigelow</u>, 367 F.3d at 570 (additional internal quotation marks and citations omitted).

The Michigan Court of Appeals did not specifically address the prejudice prong of <u>Strickland</u> on this ineffective assistance of counsel claim. Where a claim is fairly presented in state court, but the state court, although denying the claim, fails to address it, a federal court on habeas review must conduct an independent review of the state court's decision. <u>Harris v. Stovall</u>, 212 F.3d 940 (6th Cir. 2000). This independent review requires the federal court to "review the record and applicable law to determine whether the state court decision is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented." <u>Id</u>. at 943. However, the independent review "is not a full, <i>de novo</i> review of the claims, but remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA." <u>Id</u>.

In rendering her verdict, the trial court concluded that, based upon Walter Petty's

testimony, "beyond a reasonable doubt, it was either Mr. Petty or Mr. Poindexter who shot Mr. Ruff." (Tr., Vol. II, p. 31.) Based upon this statement, the trial court judge clearly did not consider Petty to be a credible witness. He denied having any involvement in the shooting and pinned the responsibility for the shooting entirely on Petitioner. Yet, the trial court still suspected that he might be the shooter. She concluded that Petitioner was the shooter when considering Petty's and Ruff's testimony together.

"When determining prejudice, a court must consider the errors of counsel in total, against the totality of the evidence in the case." 468 F.3d 338, 360 (6th Cir. 2007). In this case, although key evidence (the victim's testimony) implicated Petitioner, many other pieces of evidence, if presented, would have supported a finding that Petty, not Petitioner, was the shooter.

First, Griffin and Moore not only would have provided an alibi for Petitioner, their testimony also would have incriminated Petty. Griffin and Moore testified at the <u>Ginther</u> hearing that Petty came into the home on Hazelwood shortly before the shooting, had a heated telephone conversation with someone, hung up, ranted about someone stealing his money, and then left the home. This testimony would have provided a motive for the shooting; no explanation for Petitioner's motive in allegedly shooting Ruff was ever provided. Notably, the trial court, in issuing its findings of facts and conclusions following the <u>Ginther</u> hearing, did not find that Griffin and Moore were not credible witnesses. The trial court, instead, simply attributed trial counsel's failure to call these witnesses to trial strategy without any analysis as to whether their testimony would have altered the trial court's decision.

Given that the trial court concluded that either Petty or Petitioner shot Ruff, there is a reasonable probability that this alibi testimony may have swayed the court to conclude that Petitioner did not shoot Ruff. Moreover, although the victim's identification testimony is persuasive, the Court of Appeals for the Sixth Circuit has expressed "grave reservations concerning the reliability of eyewitness testimony." Clinkscale v. Carter, 375 F.3d 430, 445 (6th Cir. 2004). Reservations concerning eyewitness testimony particularly are salient in this case because, by virtue of the victim's injuries, there was no way to determine after the shooting whether the person he believed to be Petitioner was indeed Petitioner. In addition, Petty admitted to owning guns. The murder weapon was located in Petty's mother-in-law's house. Petty only identified Petitioner as the shooter after Petty was arrested on another, unrelated charge.

In sum, two witnesses could have testified that Petitioner was in his home at the time of the shooting and that Petty was near the scene of the crime, shortly before the shooting, and he was agitated and angry. The fact that two witnesses whose testimony, if believed, would have proved Petitioner's innocence were never called to testify, without any doubt, satisfies the Strickland prejudice prong. It is reasonably likely that testimony from two witnesses that Petty was near the scene of the crime, shortly before the shooting, and he was agitated and angry, would have swayed the factfinder to reach a different result.

As such, trial counsel was ineffective on this ground such that habeas relief is warranted.

2. Failure to Call Witnesses Juawanda and Robert Robinson

18

Second, Petitioner claims that trial counsel was ineffective in failing to subpoena and produce two witnesses, Juawanda and Robert Robinson. Although he had no supporting documentation, trial counsel testified at the <u>Ginther</u> hearing that he subpoenaed the Robinsons but that they did not timely appear.[6] Trial counsel testified that before he subpoenaed the Robinsons he spoke to them by telephone, and they "did not want to get involved." (GHT at p. 35.) He testified that if he thought their testimony would have been favorable he would have had Petitioner go out to their home himself and ensure that they appeared to testify.

At the <u>Ginther</u> hearing, Juawanda Robinson testified that, on the date of the shooting, she lived on Hazelwood Street. She was in her home when she heard a two males arguing. One of the men said, "don't do this," and she then heard two shots. <u>Id.</u> at p. 51. After the police arrived, she heard a woman ask the victim to tell the police who had done this. She heard the victim say, "Red shot me." <u>Id.</u> at p. 52. She testified that trial counsel called her home twice prior to trial, once to speak to her and once to speak to her husband. She testified that she did not receive a subpoena. She came to Petitioner's trial on February 6, 2001, because a neighbor (whose name she did not know) told her she should testify.

Juawanda Robinson's husband, Robert Robinson testified that he heard a shooting outside his home in January 2001. After the police arrived, he observed the

_____

[6] Trial counsel did not file a return of service and the Robinsons testified that they were not subpoenaed. Nevertheless, it will be assumed for purposes of this analysis that trial counsel did subpoena the Robinsons.

victim lying on the ground and pointing in the direction the shooter had fled.

The record shows that the Robinsons came to the courtroom during closing arguments.  Trial counsel testified that he did not ask to reopen proofs at that point because he "thought it would be very peculiar to ask a court at that point in time to hold off the continuation of closing arguments, as I had to call two more witnesses."  (GHT at p. 35.)  However, under Michigan law, it is within a trial court's discretion to reopen proofs to permit a late-arriving witness to testify.  <u>People v. Collier</u>, 168 Mich. App. 687, 694 (1988).

The trial court held that counsel was not ineffective in failing to call the Robinsons because "they did not claim that they saw the shooting but only heard something.  It also was indicated, I am not sure if [trial counsel] was referring to the Robinsons at that time, but I believe so, [trial counsel] did make a record during the trial in this court that there were some witnesses that were subpoenaed to be present at the trial who did not appear."  (GHT at pp. 213-14.)

The Michigan Court of Appeals affirmed this conclusion, stating, in relevant part:

> Defense counsel noted that the Robinsons were ambivalent in their testimony, and an adjournment was not requested after their late arrival at trial because of the nature of their statements.  Therefore, defense counsel made a strategic decision to focus on challenging the credibility of the prosecution's witnesses and the ability of the victim to identify the shooter.  We cannot conclude that the trial court's factual findings with regard to this issue were clearly erroneous.

<u>Poindexter</u>, slip op. at 3.

b.

The Michigan Court of Appeals' decision was an unreasonable application of <u>Strickland</u>.  Juawanda Robinson would have testified that Ruff said "Red did it" when

20

asked by police who shot him.  In addition, Juawanda Robinson would have supported a defense that two men were arguing prior to the shooting.  Failing even to request a continuance based upon a concern that it would have been perceived as "peculiar" does not reflect a sound, reasoned trial strategy.  The Michigan Court of Appeals reached a contrary conclusion based upon their finding that trial counsel testified that the Robinsons were ambivalent about their testimony.  In fact, trial counsel did not so testify.  He testified the Robinsons were ambivalent *about testifying*, not in the content of their testimony.  Given the cumulative support Juawanda Robinson's testimony would have provided for Petitioner's defense that someone else, possibly Petty or "Red", shot Ruff, trial counsel was ineffective in not calling the Robinsons.

Petitioner was prejudiced by trial counsel's failure to ask for a continuance when Juawanda Robinson did not appear in accordance with the subpoena he apparently issued and by his failure to move to reopen the proofs when she did appear.  While her testimony would not have been overwhelming proof of Petitioner's innocence, it would have provided further support for the theory that Petty or an unidentified individual named "Red", not Petitioner, was the gunman.  Had this testimony been presented in conjunction with Griffin and Moore's testimony, there is a  reasonable probability that the result of the proceeding would have been different.  As such, Petitioner is entitled to habeas relief on this ground.

### 3.  Failure to Call an Expert Witness[7]

------------------------

[7]Although as will be explained, Petitioner is not entitled to habeas relief on this ground, a more detailed discussion of this allegation is in order given the conclusion that trial counsel was deficient in this regard.

Petitioner also claims that trial counsel was ineffective for failing to call an expert witness regarding evidence of close-range firing. The victim's medical report noted a "tattooing amalgam" on the victim's face. It was trial counsel's theory that this "tattooing amalgam" indicated a close-range firing of a weapon, which, if proven, would contradict the victim's testimony that the shooter was approximately thirty feet away when the shots were fired. Petitioner argues that trial counsel was ineffective because he failed to call to testify the doctor who prepared the report or an expert witness to support this interpretation of "tattooing amalgam."

At the close of the prosecution's case, trial counsel stipulated to the admission of Ruff's medical records. Trial counsel then rested without presenting any witnesses. The prosecutor waived summation. Prior to presenting his closing argument, trial counsel again raised the issue of tattooing, drawing the trial court's attention to the fact that court reporter's medical dictionary reflects the term tattooing amalgam and asked the trial court to make its own determination regarding tattooing. At the <u>Ginther</u> hearing, trial counsel testified that he reviewed the medical records, and concluded that the records indicated that there had been some tattooing of the victim's skin. Based upon his experience and consultation with a forensic pathologist, trial counsel concluded that the tattooing indicated that the gun was fired within twenty-four inches from the victim.[8]

The Michigan Court of Appeals, in a rather detailed analysis which included a

---

[8] It is unclear from the <u>Ginther</u> hearing transcript whether trial counsel contacted a forensic pathologist in connection with Petitioner's case or whether he learned that tattooing indicates close-range firing from a previous contact with the forensic pathologist unrelated to Petitioner's case.

citation to an internet site apparently found as the result of the court of appeals' own research, held that trial counsel's representation in this regard was not ineffective.

b.

Trial counsel's belief that the trial court's level of intelligence coupled with his belief that the medical report should be interpreted a certain way were sufficient to persuade the trial court to conclude that the weapon was fired within twenty-four inches of the victim's face was objectively unreasonable.  The victim, however, testified that he had been fired upon by a gunman located approximately thirty feet away.

Moreover, on the one hand, trial counsel said he could not determine from the doctor's report and the court reporter's medical dictionary whether the "amalgam tattooing" indicted close-range firing, on the other hand, trial counsel asked the trial court to review the document and reach just that conclusion.  Trial counsel stated that the doctor never returned a phone call, yet he stipulated to the admission of the medical reports and waived the doctor's appearance.  He did not subpoena the physician who prepared the report.  Clearly the medical report needed some interpretation for a layperson.  Failing to obtain a witness who could provide that interpretation or even to investigate whether such a witness could be called falls far outside the wide range of professionally competent assistance.

The Michigan Court of Appeals concluded that the decision not to present expert testimony in this regard was reasonable trial strategy because, based upon the Michigan Court of Appeals' own research, expert testimony would not have supported counsel's argument that the tattooing referenced in the medical report indicated close-range firing.  The Michigan Court of Appeals noted that the term utilized in the medical

23

report was "tattooing amalgam." The court of appeals then quoted the definition for an "amalgam tattoo" found on a Maxillofacial Center website. The quoted definition indicated that an "amalgam tattoo" is related to a dental condition created by certain dental treatments. The court of appeals, therefore, concluded that "the failure to call an expert to clarify this testimony was purposeful trial strategy." Poindexter, slip op. at 5.

In reaching this conclusion, the Michigan Court of Appeals', without explanation or justification, determined that a "tattooing amalgam" is identical to an "amalgam tattoo." The Court finds this logical leap absent any expert analysis or support to be unjustified. While a court is required to afford counsel a great deal of deference when evaluating ineffective assistance of counsel claims, a court is not required, with the benefit of hindsight, to create a strategy for counsel where none existed. Trial counsel admitted that he concluded the tattooing referenced in the medical report indicated a close-range firing and that he relied upon his own experience and the trial court's intelligence to conclude as much. He did not decide not to present any expert testimony because he believed expert testimony would undermine his argument. In fact, he testified that a forensic pathologist's work supported his conclusion. Therefore, the Michigan Court of Appeals' finding that the decision not to present an expert was purposeful trial strategy is an unreasonable application of Strickland.

Having determined that the first prong of Strickland is satisfied, it must be determined whether Petitioner was prejudiced by his attorney's failure to present expert testimony regarding evidence of close-range firing. This issue is a difficult one because trial counsel's failure to question the treating physician about the "amalgam tattooing" or to obtain an expert to testify in accord with counsel's belief that the tattooing indicated a

close-range firing was an egregious failure to act as competent counsel.  Nevertheless, constrained by the <u>Strickland</u> standard of review, Petitioner has failed to show that he was prejudiced by counsel's error.  Petitioner has not shown that the physician-author of the report or a retained expert would have testified that the report supported a finding of close-range firing.  Petitioner asserts a conclusory argument: "Had counsel called an expert, either medical or firearms-ballistics, the physical-medical evidence of close-range firing would have made Ruff's version of the shooting a scientific impossibility."  Appellant's Application for Leave to Appeal at p. 33, filed in Michigan Supreme Court and attached to Petitioner Poindexter's Supplement Brief and Appendix.  Petitioner also cites to *Medicolegal Investigation of Death*, Edited by Warner U. Spitz, M.D., and Russell S. Fisher, M.D., Charles C. Thomas Publisher, 1973; Chapter 4, "Injury by Gunfire."  This is insufficient for the Court to conclude that an expert in *this* case would have testified that there was evidence of close-range firing.  Thus, Petitioner has not shown that he was prejudiced by his trial counsel's failure to present such evidence.  As such, he is not entitled to habeas relief on this ground.

4.  Remaining grounds:  Failure to Interview Petty and Cecilia Bettis Prior to Trial; Failure to Disclose Relationship With Petty and Keep Petitioner Apprised of his Defense; and Failure to Call Petitioner as Witness in Own Defense

Petitioner's remaining grounds of alleged ineffectiveness do not warrant habeas relief and require only a brief discussion.  Petitioner alleges that trial counsel was ineffective in failing to interview prosecution witnesses Petty and Cecilia Bettis prior to trial.  Although denying this claim, the Michigan Court of Appeals failed to specifically address it.  Therefore, as discussed above, the Court undertakes an independent review of the state court's decision.  <u>Harris v. Stovall</u>, 212 F.3d 940 (6th Cir. 2000).

While competent defense counsel diligently representing a defendant likely would have conducted pretrial interviews of Petty and Cecilia Bettis, and trial counsel was likely deficient in this regard, Petitioner has failed to show he was prejudiced by his attorney's failure to do so. Counsel's cross-examination of both witnesses was relatively thorough and Petitioner fails to show how counsel could have been better-prepared for these witnesses or to suggest questions he may have posed had he interviewed them prior to trial.

Petitioner also claims that trial counsel failed to keep Petitioner apprised of the preparation of his defense by failing to disclose a potential conflict of interest and failing to disclose that Walter Petty would testify against him and that trial counsel had previously represented Petty. The trial court held that Petitioner was not prejudice by trial counsel's prior representation of Petty. On direct appeal, the Michigan Court of Appeals also concluded no conflict of interest existed, relying upon the trial court's credibility determination that trial counsel had informed Petitioner that Petty would testify against him and would be a damaging witness. This Court is not in a position to challenge the state court's credibility determination in this regard. Trial counsel testified that his previous representation of Petty had concluded and that it did not impact his representation of Petitioner. Based upon the record before it, the Court determines that the Michigan Court of Appeals' holding that Petitioner was not deprived the effective assistance of counsel in this regard was not contrary to or an unreasonable application of Strickland.

Finally, Petitioner claims that trial counsel was ineffective in failing to present Petitioner as a witness in his own defense. At the Ginther hearing, trial counsel testified

26

that he advised Petitioner not to testify because he felt that the defense would have nothing to gain by his testimony.  He thought the defense was going well and putting Petitioner on the stand would prove too risky.  Trial counsel also testified that Petitioner admitted to him that he had fired a shot because he thought someone was "messing with his cars."  (GHT at pp. 34-35.)  Petitioner's <u>Ginther</u> hearing testimony contradicted trial counsel's testimony on these points.  The trial court resolved the credibility contest in favor of trial counsel.  The Michigan Court of Appeals concluded that the matter was within the realm of trial strategy.  Although much of trial counsel's testimony at the <u>Ginther</u> hearing appears evasive, combative, and apparently less than candid, given that this Court did not have the benefit of observing the demeanor of these witnesses, it, as it must on habeas review, defers to the trial court's credibility determination on this point.  Accordingly, the Michigan Court of Appeals' conclusion that counsel was not ineffective in failing to present Petitioner's testimony was not contrary to or an unreasonable application of <u>Strickland</u>.

### C.  Actual Innocence Claim

Petitioner also argues that habeas relief should be granted because he is actually innocent.  Petitioner presents a persuasive case that serves to undermine the confidence in the state court's verdict.  But, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." <u>Herrera v. Collins</u>, 506 U.S. 390, 400 (1993).  Even if free-standing actual innocence claims were cognizable on federal habeas review, "the threshold showing for such an assumed right would necessarily be extraordinarily high."

Id., at 417.  In <u>Herrera</u>, the Supreme Court assumed that, "in a capital case a truly

persuasive demonstration of 'actual innocence' made after trial would render the

execution of a defendant unconstitutional, and warrant federal habeas relief if there

were no state avenue open to process such a claim." <u>Herrera</u>, 506 U.S. at 417.

Petitioner's claim of actual innocence in a non-capital case does not fall within the

<u>Herrera</u> exception.

V.  Conclusion

For the reasons stated above, Petitioner received ineffective assistance of

counsel and the state court's finding to the contrary was an unreasonable application of

<u>Strickland v. Washington</u>, the petition for a writ of habeas corpus is **CONDITIONALLY**

**GRANTED**.

Unless a date for a new trial is scheduled within ninety days, Petitioner

Poindexter must be unconditionally released.

**SO ORDERED**.


Dated:  May 30, 2007

>  s/Avern Cohn                  
> AVERN COHN
> UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was mailed to the parties of
record on this date, May 30, 2007, by electronic and/or ordinary mail.

>  s/Julie Owens                 
> Case Manager, (313) 234-5160